# Supreme Court of the State of Georgia,

## AT ATLANTA,

# JANUARY TERM, 1871.

Present.—O. A. LOCHRANE, CHIEF JUSTICE.
H. K. McCAY, } JUDGES.
HIRAM WARNER, }

| 42 | 9 |
| 105 | 685 |

GILBERT M. ANDERSON, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

1. An indictment, which alleged the offense to have been committed on the 13th day of August, 1868, and found by a grand jury, drawn according to the laws of the State which existed prior to the adoption of the Constitution of 1868, was a legal and valid indictment, though found subsequent to the date thereof.

2. When the defendant filed a special plea of insanity, but did not insist that there should first be a trial on that special plea, but went to trial on the general issue of not guilty, and relied on the insanity of the defendant to show that he was not guilty of the offense charged, it was not error for the Court to refuse to charge the jury that they might find a verdict either for or against the special plea of insanity, the Court charging the jury that they might find the defendant guilty, under the evidence, or not guilty.

3. There was no error in the charge of the Court to the jury, " that they were the judges of the law and the facts, so as to enable them to apply the law to the facts, and bring in a general verdict, but they had no right to make law; the law was laid down in the Code; it was the province of the Court to construe the law and give it in charge, and of the

Anderson *vs.* The State of Georgia.

jury to take the law as given, apply it to the facts as found by them, and bring in a general verdict;" and in refusing to charge as requested by defendant's counsel upon this point in the case.

4. The Court did not err in charging the jury, "that if the condition of the defendant's mind was such that he could distinguish right from wrong, good from evil, and while in that condition, killed his wife, the law would hold him responsible," and in refusing to charge as requested.

5. Under the 4599th section of the Code, it was the duty of the presiding Judge to have had the evidence in the case taken down, that is to say, all the legal evidence allowed to go to the jury; but as the record does not show any particular facts given in evidence, which the Court instructed the Clerk not to record, this Court cannot say whether the same were material or immaterial, legal or illegal, or whether the Court in its directions to the Clerk, expressed, in the presence of the jury, any opinion as to the evidence which was legally submitted to the jury for their consideration. To have made it error under the Code, it must be affirmatively shown that the Court expressed an opinion, in the presence and hearing of the jury, in regard to the evidence legally submitted to them on the trial.

6. It is the right of the witness to have the testimony read over to him, but not the right of the defendant's counsel that it should be so read; the legal presumption is that all the legal testimony in the case was correctly taken down under the direction of the Court.

7. In view of the facts of this case, there was no error in the Court which could have influenced or controlled the verdict, in refusing to allow Dr. Terry to explain to the jury "the structure of the brain, what changes were produced upon it by bodily disease, or how its irritation and inflammation was calculated to present to the mind unreal images, upon which a person with a diseased brain might be induced to act, as though the imaginary impressions were real existences."

8. The Court charged the jury that, "if, upon the whole evidence in the case, the jury entertain a reasonable doubt as to the sanity of the prisoner at the time of the commission of the alleged act, they are bound to acquit him:"

*Held*, That after a careful review of the evidence contained in the record, and the errors assigned therein, that the judgment of the Court below in refusing the motion for a new trial should be affirmed.

Murder. Insanity. Jurors. Before Judge JOHNSON. Muscogee Superior Court. May Adjourned Term, 1870.

At November Term, 1868, of said Court, said Anderson was indicted for the murder of his wife, in said county, on

Anderson *vs.* The State of Georgia.

the 13th of August, 1868. At said term, he pleaded that, at the time of the alleged commission of said act, charged in the indictment, he was insane; that he is subject to fits of insanity, and if such act was committed by him, it was committed when he was in a condition of lunacy. Issue was joined on this plea, and tried by a special jury, who found that, when said act was committed, (on the 30th of August, 1868,) said Anderson was sane. A new trial was moved for. Before it was heard, this Court had decided the case of *Long vs. The State, 38th Georgia Reports,* 491. Upon it, said verdict was declared null and void. In May, 1870, there was a motion to change the venue on the ground that an impartial jury could not then be had. It was supported only by Anderson's affidavit, and was overruled.

In July, 1870, the case was tried upon the plea of not guilty. The evidence was as follows:

STEPHEN QUARTERMAN testified: I know the prisoner. About the 30th of August, 1868, I met Sam Anderson in the road, and he told me that his father had killed his mother. I went over to prisoner's house, and found Mrs. Anderson lying at the gate, with her head cut very badly. I went into the house and found it on fire, the bed was on fire, the table afire, and dresses afire. I was looking for a bucket when I met prisoner in the shed-room; he advanced toward me, saying, " Quarterman this is my place, and I don't want to be interferred with." I left him and went back toward the gate. The fire was so hot that the gate posts were smoking; so I moved Mrs. Anderson across the road, about twenty-five steps, and then prisoner came out of the house with his coat on his arm and pipe in his hand, cleaning his pipe; he walked up the road to where Mrs. Anderson was lying, and stooped down and felt of her side, and took his knife and stabbed her about the waist. He drew his knife out and made at us; the other man fell over the fence in his fright, and ran entirely off. I jumped over the fence and took a rail in my hands; prisoner said, " Quarterman, don't strike me with that

rail, Quarterman, and I will not hurt you." Prisoner stepped back from the fence where Mrs. Anderson was lying with her head on a stick of wood, and said that he wanted to kill John Bachelor, Sally Anthony and Billy Bachelor. About this time Mr. Thomas Anthony rode up on a horse, witness then left; John Bachelor, Sally Anthony and Billy Bachelor were children of Mrs. Anderson by a former husband. The skull of Mrs. Anderson was split in three places to the brain. The killing was done in Muscogee county, about eight miles from Columbus. I saw prisoner setting one place on fire in the shed-room; the house was completely burned up, and so was the kitchen. When the prisoner stuck the knife into Mrs. Anderson I saw her draw her leg up. Mrs. Anderson asked me not to let prisoner kill her. Mrs. Anderson died in two days afterwards.

*Cross-Examined:* I had known the prisoner from Christmas until the time of the killing, about nine months. The prisoner made no attempt to get away from the place.

*Re-Examined:* His eyes looked natural. When I first saw him in the shed-room his face was unusually red.

AMOS L. ANDERSON testified: Myself, mother and father (the prisoner) were eating dinner in the kitchen, which was in the rear of the house. Father was quarrelling about some pot liquor, and took up a saucer of butter and some bread and went around the house and then came back and set it on the floor, and then went out and picked up a battering stick, and came again into the house, and as he was again going out, mother threw some warm dish water at him and on him, and followed after him into the house. Father caught up a drawing knife and turned on her and she ran. He followed her and cut her down between the piazza and gate, and cut her four or five times with the edge of the drawing knife on the head. She was lying on her side. Father ran after me, and I ran, because I thought he was going to kill me. I stopped at a distance and watched him. Father then went into the kitchen and got some fire, and

went into the house and set it on fire in many places, and went out and got the axe and cut the well-windlass and rope, and threw the bucket into the well, and then went back into the house. I went in the house and threw some water on the fire. He saw me and ran at me, and I jumped out at the window and went over to old man Anthony's. The prisoner is my father and Mrs. Anderson was my mother. My mother died in a few days. I am twelve years old.

*Cross-Examined:* Father had been at home from Thursday previous. He killed mother on Sunday. He was not drunk, and did not have any liquor in the house.

W. R. YOUNGBLOOD, M. D., testified : I was called to see Mrs. Anderson about three hours after she was cut. I found four or five mortal wounds in her head, either of which would have produced death. The wounds were made with a cutting weapon. She had a wound on her side, also her left little finger was cut off and also her shoulder was cut.

*Cross-Examined:* Her death was caused by the wounds on her head. The wound in her side was not a mortal wound. If, however, it had reached her heart, it would have produced instant death.

### TESTIMONY FOR THE DEFENSE.

L. B. ANDERSON testified : I went to see my mother soon after the Mexican war, and I found my brother (the prisoner) in a very low state of health. Some years afterward he apparently got better. My mother informed me of his conduct, before I got there, relative to his treatment of her and of the family. She stated that she thought his mind was considerably injured since the war (*i. e.* the Mexican war). She said he was very troublesome to the family. I advised her to put him in the asylum. She also stated that he had attempted to take her life, and that she was much alarmed and feared he would do it. He had threatened, also, to burn up the plantation. My mother begged me to take him to my plantation in Harris county, stating that she disliked to put

him in the asylum, and thought I could manage him better.
I replied that if they would send him to my place in Harris county, I would take charge of him.   My mother and
prisoner then lived in Baldwin county, near Milledgeville.
Prisoner was sent to my house, and I treated him cautiously
and kindly, and his health and mind got better.   After several years had elapsed, I got him a position as overseer.   In
a short time he became, as I considered, insane, and I sent
for him to come home to me.   He remained with me for
some time, until he be became, as I considered, competent to
do business.   I then got him a place at Mr. Pollard's.   When
I went to my mother's (at the time spoken of before), I found
that he was kept in an out-house, with an attendant.   While
I was there, he attempted to commit suicide by cutting his
throat with a razor.   The wound was a very serious one.
Dr. Harper, of Milledgeville, attended him.   About fifteen
days before the killing he came to my house in Harris county.   When I saw him coming, I hardly knew him—he looked
so changed in his appearance; but when he came to the gate,
I recognized him.   I met him at the gate, and he appeared
to be considerably frightened.   He said he was in great
trouble and that I must not ask him any questions at that
time.   Having known him before, I knew that at that time
he was deranged.   I took him in the house and waited until
the proper time and took him aside; and he told me that
troubles at home were so great that he could not remain
there, that his wife and her son Billy Bachelor had threatened to kill him, or that they would have it done; that he
should not remain at home.   I saw that his mind was wandering at that time about this matter.   Prisoner seemed very
excitable and nervous; he would stay some time in the house
and some time in the bushes, but would not remain at any
one place for any length of time.   Prisoner said he had the
dropsy, and requested me to come to Columbus and get him
some medicine, which I did forthwith.   After several days
he took his mule and left, and went to some relatives of his.

I was with him while he was with his relatives, and saw his conduct, which was wild and strange. After a short stay he left his relatives, saying he was going to Mud Springs, and returned to his old home where the killing was done. Prisoner was twenty years old when he went to the Mexican war. Previous to that time he was very sociable, healthy and peaceable in his habits. After he returned he was not sociable. He also suffered very much from diarrhœa. He was very restless during his last visit to Harris county, and appeared to want to eat all the time. He had a blanket with him, and would leave his bed at night and go out in the woods and lie down, and then come back and continue to move about in this way during the night. I have another brother who is subject to temporary fits of insanity. I have still another brother who is perfectly sane.

*Cross-Examined:* Prisoner told me that he and his wife were always quarreling. He has often drank to excess while in Baldwin county, and aferwards. When I was in Baldwin county I was told that he went out into the horse-lot and gashed the horse with his knife, until he was stopped; I saw the scars. He was very abrupt to his mother and sisters. There was never any proceedings taken to put him in the asylum, for the reason that his mother thought I could control him. He married in 1854 or 1855, in Harris county, a widow, (the person killed,) who had some little property, and three children. Prisoner moved to his late home in 1854, or thereabouts. Prisoner is fifty-two years old, four years younger than myself. Mrs. Anderson, the deceased, told witness that she had found prisoner to be a good husband, but that he was not of sound mind at times, and witness told her that she must treat him kindly, and she said she knew that to be best.

Col. JAMES M. MOBLEY testified: The first time I ever saw prisoner was about twenty years ago, he was overseeing for Mr. Pollard; I saw him only a few times then. There was nothing unusual about him but a sad and melancholy

appearance. Some time after he went into the employ of one
Daniel Hightower, as overseer. While he was there the
family sent for Dr. Louis and myself, their attorney, to ad-
just a difficulty; when we arrived we found prisoner in a
great rage and greatly excited, using profane language and
gritting his teeth and foaming at the mouth. He proceeded
with accusations against a negro man named Wash, viz: that
Wash contemplated an outrage upon one of the ladies of the
family, and declared that he had to be killed. The brother
of the lady and the rest of the family were present, but did
not believe it to be true, considering it merely a hallucina-
tion on the part of the prisoner; whenever the man, Wash,
would pass in sight of prisoner he would rave and cry out
that he must be killed, and as soon as he would pass out of
sight, prisoner would weep like a child; this occurred several
times. We investigated the charges against Wash and found
them to be utterly unfounded. This seemed to enrage the
prisoner more, and we failed to quiet him for a long time;
during this time he appeared to be perfectly reckless and un-
reasonable, and in a fit of uncontrollable anger. After re-
maining a large part of the day, I took the prisoner off to
himself and advised him to leave Mr. Hightower. He still
insisted that he must kill Wash before he left, but finally
consented to leave; I then left. I saw prisoner a few times
after that, during Buchanan's presidential campaign. When
not excited he appeared very reasonable and quiet. I saw
him on a few occasions during the campaign very much ex-
cited. I saw him also several times after his marriage, and
he was generally quiet, until the last time I saw him, which
was in August, before and just previous to the killing; I
met him in the road seven miles from Hamilton; he was so
changed in appearance that I could scarcely recognize him;
he looked to be in a very low state of health, and had a wild,
unnatural look out of his eyes; he was riding on a mule. I
asked him what was the matter; he replied that he was nearly
dead, showed me his legs, and referred to his troubles, and

Anderson *vs.* The State of Georgia.

said he had no money to buy provisions and medicine, and would have to rely upon his friends for aid. He seemed ravenously hungry, and devoured with great rapidity some peaches that lay in the foot of my buggy. A few days afterwards he came to my house and stated that he was hungry, and wanted to wait until after dinner, which he did ; he pulled out his pipe and walked out into the piazza and called me to come there ; he seemed to be very much excited, and referred to his difficulties, his condition and his poverty ; that his family had possession of everything, that he would have to die soon. His conversation and appearance was very unsatisfactory and unpleasant, his expressions were wild, and he said that he did not care to live. I am satisfied at the time of our conversation, just before the killing, he was insane, and at the time of my investigation at Hightower's he was an insane man. He was not under the influence of liquor at Hightower's, nor at the time of our last conversation spoken of.

*Cross-Examined:* Prisoner said that he was in great trouble about his wife and wife's kin. He conducted himself as men in his state do, while he was at dinner. He was considered a pretty good overseer while at Pollard's. He was under the influence of liquor a good deal during the presidential campaign.

Dr. CHARLES BEDELL testified : I saw the prisoner, for the first time, in the streets of Hamilton. We were approaching each other on the street, when he called to me in a loud voice to stop, and at the same time drawing a pistol and advancing close up to me, waving the pistol up and down. He was furious, and seemed to desire a difficulty with me. He was an utter stranger to me ; I had never seen him before. I was very much frightened, but preserved my presence of mind, and addressed him kindly, and told him I was not the man he was looking for. His language was very violent, but he finally became quiet. My impression, at the time, was that he was some deranged man that had

escaped and come to the town. I was very close to him but could not discern an evidence of liquor. I walked with him to a store, and there some gentlemen got to talking to him, and advised him to become more quiet; he then became more quiet. He could give no reason for calling to me to stop.

*Cross Examined:* He did not know my name and did not call me by name when he halted me. I cannot state, positively, whether his conduct was influenced by liquor; I did not smell liquor, nor did prisoner take any at the store where we stopped.

SAMUEL McCANTS testified: The first time I ever saw prisoner was at Pollard's; he remained at Pollard's about a year. One morning I saw prisoner standing on my plantation; I hailed him and asked him what he was doing there; he did not speak, but motioned to me with his hand, in a very mysterious manner, to come there; I went to him and asked him what was the matter; he answered, that there were two men after him trying to catch him. I asked him what he had done; he said, "I have killed a man;" he seemed alarmed, and kept looking for some one to come after him. He would not go to my house to breakfast, but he ate some that I brought him, sitting on the ground. After he had finished his breakfast, he asked me to lend him my knife to protect himself with; I refused to give it to him. I asked him where he was going; he did not answer, but pointed to the woods, and went to the woods.

*Cross-Examined:* The prisoner stayed at Pollard's; he made a good crop. From what I could learn from him, he seemed to think that he had killed a man in Mobile. I was then Justice of the Peace in his district, and never heard him accused of killing anybody. Shortly after this, prisoner sent me word by Dr. Beall, "Please to put him in the Asylum."

Col. JAMES N. RAMSEY testified: I have known prisoner since about seventeen years ago. When I first knew him he was overseeing for my father-in-law, Mr. Pollard. He came about the middle of the year and remained until the end of the

Anderson *vs*. The State of Georgia.

year. During that time there was no violent paroxysm, but his mind seemed unhinged, and would literally fly to pieces, for very slight causes. He was not in the habit of drinking, while at Pollard's. I have seen the prisoner at various times; he came to my office and spoke to me about his troubles, and about some law-suits, but I could not understand, his conversation was so disjointed. I looked upon him as a man of unsound mind. This was a short time before the killing. He said that he wanted to die—and said that the Bachelor boys were killing all the stock in the neighborhood, and bringing them to town and selling them. After talking awhile, he would bow his head in his hands and weep excessively. I advised him to leave home and go to Harris county, for I thought a change of scene would benefit his mind. He was not drunk, at our interview. I have seen the prisoner drinking; he generally gets stupid when he is drinking.

*Cross-Examined:* He left Pollard's on account of a fuss with the foreman. When he was at my office he spoke about some business transacted by Colonel Mobley, but his language was so incoherent that I could not understand him. He said he did not want to commit murder—and did not want to be murdered. He seemed to be in great agony and would cry. All of his actions were like those of an insane man.

Dr. R. GOODLOE HARPER testified : He was a physician, living in Milledgeville, Georgia. He became acquainted with prisoner, soon after prisoner returned from the Mexican war—was physician then for prisoner's family. Prisoner was in very low health—had chronic diarrhœa and dropsy, and his brain was affected. Prisoner was reduced in flesh and very weak, and from the infirmities of his body, his mind was affected. He was melancholy and misanthropic. Witness recollected upon one occasion when he was called to see prisoner, witness was firmly convinced that he was insane, plied him with questions to test his mind and prison-

er's answers were incoherent and at variance with the questions; *e. g.*, when he asked him, "When are you going away," prisoner replied "I did;" thinking that probably he had misunderstood the question, he expounded and repeated and repeated it; there came the same reply, "I did." To other questions answers given were equally foolish. Prisoner was not then intoxicated. Was called in to see prisoner on one occasion and found his throat cut. Prisoner had tried to kill himself with a razor. He then showed evidences of insanity. His mother and sisters feared him. He was easily aroused by slight causes, and when so aroused was violent. I considered his mind diseased—proceeding from a diseased body. Witness has practiced medicine for about twenty-five years; is a regular graduate; has lived during his practice in Baldwin county, Georgia.

Mrs. L. A. GIBSON testified, that she is a sister to the prisoner. Lives in Baldwin county, Georgia. Prisoner volunteered in the Mexican war, from Baldwin county. Before, and at the time the prisoner left for the Mexican war, he was of a very easy and pleasant disposition and temper, and a healthy man; when he returned from said war, he was entirely changed; was very weak; could scarcely drag himself about, and was taciturn, sullen, and melancholy. He had diarrhœa, and doctors said he had dropsy. Witness' mother lived eight miles from Milledgeville. Witness and prisoner both lived with her. Witness and her mother were very much afraid of prisoner; he would be excited to frenzy by very slight causes, and often by no cause. They were cautious to address him only when necessary, and then in the mildest manner. While at his mother's, prisoner was kept in an out-house in the back yard. He was scarcely able to get about. He had no way to get to Milledgeville, except to walk, which he did not, because unable. He afterwards attempted to cut his throat with a razor; Doctor Harper attended on him while his throat was cut. Witness and her family now regarded him as an insane person, and sent him

Anderson *vs.* The State of Georgia.

to his brother, L. B. Anderson, of Harris county, who thought he could manage him. This was in the year 1850.

Dr. E. J. KIRKSCEY testified, that at the time of the killing he was County Physician. First saw prisoner at the gubernatorial election, in 1868, held at the Court-house, in Columbus, Georgia. Witness was one of the democratic challengers. Prisoner came up to vote with a radical ticket in his hand ; witness asked him what was the reason he voted such a ticket; prisoner replied, *"if I don't they will kill me."* Not long before the killing, while witness was attending at the poor-house of this county, he was approached by the prisoner in an excited and threatening manner ; prisoner demanded possession of the poor-house, alleging that Governor Bullock had appointed him poor-house keeper, and that he meant *to have it;* witness noticed prisoner's strange and wild demeanor, and tried to explain to him his folly ; warned him off, and stated that if prisoner had come any nearer, he would have killed him; witness thought him crazy; told poor-house keeper not to let prisoner come about there any more, and to use force, if necessary to such end. Prisoner went off, and a few days prior to the homicide, being shortly after the above interview, witness was approached by prisoner, in an humble manner, he, prisoner, desiring to be taken into the poor-house, alleging that he had been turned out of home and had no place to live at. Saw prisoner next, after the homicide, at the jail, two or three days after said homicide. Prisoner appeared rational, but on visiting him almost daily, he lapsed into a stupor, lasting for about eight or ten days, during which time I could get nothing from him. After that, he, (prisoner,) speaking to witness, said that Woolly (the prosecutor in the indictment,) had been there that morning and dunned him for ten cents, and thereat grew furious, and swore that if he had Woolly in that jail, with a gun each, he would mighty soon put an end to him. Prisoner had a severe looking scar on his head; don't know how deep it was; it is a place where, if deep enough, it·

would affect the brain; prisoner had syphilis also, and a scar across his throat; prisoner had, also, an ulcer on his leg, which witness dressed.

Dr. SAMUEL A. BILLING testified: I have heard the testimony of the previous witness—my opinion is from the testimony. I have heard that, at the time of the killing, the prisoner was insane; laboring under that species of insanity called monomania. My opinion is, that he was insane at several periods of his life, as shown by the testimony.

*Cross-Examined:* Monomania is when a person is insane upon one subject. In this case, the disease of the prisoner was homicidal monomania.

DR. F. A. STANFORD testified: I have heard the testimony, and from that testimony I would say the prisoner was insane, said insanity partaking of moral insanity. Moral insanity may partake of homicidal mania, and I think the prisoner was affected with homicidal mania. I have practiced medicine twenty-two years.

*Cross-Examined:* My opinion is that this moral insanity existed in the prisoner from the time he came from Mexico, until the time of the killing. He, in all probability, had lucid intervals, sometimes of long and sometimes of short duration. I visited his wife after the cutting, and in returning went to the jail out of curiosity to see the prisoner. He was in a very feeble condition. A few days before the killing prisoner came to my office. He was very feeble, but could give no clear account of his health or condition; I saw the prisoner the next day after the cutting, in the jail; he looked very badly. I asked how he came to commit such an act. He looked at me in a wild and vacant manner, and replied, "Dr. I could not help it, I was crazy." The remark made an impression upon my mind, and has been a subject of grave reflection ever since, and in considering it with the evidence given in, it tended to convince me that he was the subject of moral insanity. I do not consider that the prisoner could distinguish between right and wrong at the time of the kill-

ing, (this last sentence was in answer to questions by the Judge presiding.)

DR. E. F. DEGRAFFENRIED testified: I have made a personal examination of prisoner; I examined his head in jail, and found a scar of an indenture in his skull; I concluded that it was sufficient to produce weakness of the mind. I think at the time of the Hightower difficulty he was laboring under some hallucination of the mind.

*Cross-Examined:* Prisoner stated to me that he received the wounds by a blow from a bar of iron, in the hands of a man in Milledgeville, Georgia; I regarded his account of it as rational. This interview was a year after the killing. I think there is evidence enough to show insanity at various times, and that there were times when he had lucid intervals. A man may be affected with homicidal mania and still conduct his usual business.

Dr. T. J. WOOD testified: My opinion from the testimony is, that at the time of the killing, the prisoner was an insane man. I have read all the evidence over taken down by the Clerk, both of the State and defense.

*Cross-Examined:* I make my opinion up from the testimony of Dr. Harper relative to the suicidal attempt, Col. Mobley's evidence, and others. Prisoner was a monomaniac in reference to troubles in prisoner's family, the subject of killing or being killed. Physicians might talk to an insane man, and yet not be able to discover his insanity.

Dr. V. H. TALIAFERRO testified: I have read the evidence in this case as taken down by the direction of the Court. I am a physician, have been practicing fifteen or eighteen years; from the evidence of the State and defense, I am of the opinion that he was insane at the time. I consider him an insane man, partaking of monomania, and his particular mania was homicidal mania. I examined the prisoner. I am very certain that his skull has been fractured, and very often such fractures result in mania, especially when there is a predisposition to mania.

*Cross-Examined:* I asked him how he came to have the gash in his skull, · and he said it was done by a stick, after he came back from Mexico. His account of it was perfectly rational. My opinion of homicidal mania is based upon the evidence of Judge Samuel McCants, Dr. E. J. Kirkscey, Col. Mobley, Dr. Bedell, and others. I think the homicidal mania was connected with general mania. I had no acquaintance with prisoner before the killing. During my conversation with the prisoner at the jail, I brought him to the subject of his wife. He said that his wife and family had for a long time been his enemies; that they had desired to get rid of him or destroy him; that they had tried to do this by inviting persons to his (prisoner's) house to eat him out of house and home, and by these means to starve him; that his wife would invite large crowds of hypocritical Methodists to his house, and cause them to live upon him for weeks at a time, and by these means he was kept miserable and wretched. His difference in his manner while on this subject was conclusive to me that he was laboring under a delusion. I do not think, that at the time of the killing, prisoner knew good from evil.

### FOR THE STATE, IN REBUTTAL.

H. L. ANTHONY testified: When I rode up, the morning of the killing, I found prisoner standing in the road, not far from his wife's body, smoking his pipe; he called out to me in a loud voice, saying, viz: "I have committed murder," not to hurt him, or let anybody else hurt him; that he would go with me, or any other man, to the sheriff; I told him to put up his knife and behave himself, and I would not let anybody hurt him; prisoner replied, "I will try and do so," and then he put up his knife. Prisoner said he wanted the law to take its course, and added, "if I am hung, I want you to have me buried at widow Brook's graveyard." Soon after this, Mrs. Anderson's son-in-law, J. L. Anthony, rode up; prisoner called out to him, also, saying, "I have commit-

ted murder." J. L. Anthony had a gun. Prisoner said, "Jud, don't you shoot me!" Jud replied, "you deserve shooting." While we were talking, a Baptist minister rode up; prisoner called out to him, saying, "I have committed murder, and I want a big Bible with big print." Prisoner said he had set the house on fire; I asked him why he had set the house on fire, and he replied, "I did it to keep it from doing Bill and John Bachelor any good;" the house was burning when I got there. Mrs. Anderson was lying on the left hand side of the road. My opinion, from facts testified to by myself is, that prisoner is a sane man.

*Cross-Examined:* I have sometimes doubted, in my own mind, his sanity, but watched him a long time, and saw him do no act, while sober, showing he was insane. I consider him sane at the time of killing.

ISAAC T. BROOKS testified: I have known the prisoner since 1837. I first knew him in Baldwin county for a period of about four years. Prisoner was a farmer, and a close neighbor to me. After I left Baldwin county, in 1841, I never saw prisoner any more until 1857; I saw him in a field and called him to the fence, and we had a conversation about when we were boys together; his conversation was rational. Just before the war, I had a long conversation with him at Mr. Whitten's; I saw nothing wrong about him. Prisoner stayed all night with me during the war, and we had a conversation about the war. I was the tax collector; collected taxes from him; I saw nothing wrong. I had a conversation with prisoner the Spring before the killing. He was a drinking man, and pretty rapid when drinking.

*Cross-Examined:* When I knew him, in Baldwin county, he was a very healthy and a very powerful man. He was a very sociable man when not drinking. When I saw him, during the war, he was considerably reduced, and not as cheerful as he formerly was; he appeared to be in very bad health and troubled. In the Spring before the killing, at the time spoken of by me before, his health was very bad.

I never heard of his attempting to cut his throat until after the killing.

*Re-Examined:* My opinion formed from the facts testified to by myself, and from my knowledge of him, is, that he was a sane man.

J. M. ALLEN testified: I knew the prisoner in Harris county, lived on an adjoining plantation in 1851. He was overseeing for Col. Pollard, saw him often. I knew him while he lived at Hightower's; knew him during the war. He was a good farmer, and an excellent overseer. Our conversation was concerning farming and negroes, and he talked with as good sense as any man I ever heard. From my knowledge of him I consider him a man of sound mind and good judgment.

*Cross-Examined:* I know nothing of the difficulty at Hightower's or McCant's.

GEORGE W. MARTIN testified: I arrested the prisoner the day of the murder. I met Mr. Woolly and prisoner and several others on the road. I told the prisoner that he was my prisoner, and prisoner asked me if I had got the warrant. I told him that I had none, but as sheriff of the county I had a right to arrest him. He submitted very willingly. I asked him on the way to jail how he came to commit the murder. He said his wife did not want to live with him, and had sued him for a divorce. He said he burnt the house because he did not want the Bachelor boys to have the benefit of it. He said he wanted a Bible with large print and a pair of glasses. That he killed his wife because she did not want to live with him, that he and John Bachelor had a fuss that morning and that Bachelor had drawn a knife on him. He had nothing with him but some medicine and his pipe. Never saw anything that looked like he was insane.

*Cross-Examined:* He was sober that day. He said that the Bachelor boys were against him, and that his wife sided with them. My first acquaintance with prisoner was in

1863; he was in feeble health; he never lived in my house, and I never lived with him.

GEORGE WHITTEN testified: I got to the house of prisoner about two or three hours after the killing. Prisoner said he had burnt his own house and killed his wife, and if he could kill Bill and John Bachelor and Sally Anthony he would be satisfied. I sold a place to him about three and a half years before the killing. From my acquaintance with him I would say he was the keenest man at a trade that I ever saw. I consider him sane.

W. H. ADAMS testified: I have known the prisoner since 1860. I lived about four miles of him for three years, and for one year within a mile. He has told me many times about an out-house in Baldwin county that his family confined him in, and that while he was there an old negro woman used to carry him liquor privately, by the bottle. He was a good neighbor; he used to visit me and I him. I considered him of sound mind. After the war, and his negroes were taken from him, he was not the same man. I always considered him sane. About two weeks before the killing, he saved me from drowning in the creek.

A. L. ANDERSON, (re-examined): John Bachelor was at father's house on the morning of the killing. Father and John had a quarrel. John Bachelor got the mule to go to church. Father said go after Bill Bachelor and bring him here, and I will go over into Alabama and fight him a duel.

*Cross-Examined:* I did not see John Bachelor draw a knife on prisoner. I would have seen it if he had done it.

JOHN C. DUCK testified: I have known the prisoner since 1863; lived a mile apart. Prisoner was a good neighbor to me. I was in the army with him; three or four weeks in the same company and in the same tent. He behaved very well as a soldier. I saw no evidence of insanity during that time. I never saw anything that would induce me to think him insane. When he was drunk he behaved very foolish, like he had no sense at all. About two weeks before the

killing, I found him drunk on the road; I took him in my wagon, and prisoner soon began to talk about his family, and said that he had a good wife, but she would take up with the boys; had more trouble than he could bear. He said he had been off at work, and could not stay at home. I was at prisoner's house about one hour after the killing. I went up to prisoner and spoke to him, and he said, "John Duck, how are you; I want you to go with me to George Martin's, (the sheriff)." I told him I would go after George Martin, and started, and prisoner said, "You can't arrest me without a warrant, and you will have to stand in the hot sun until you go to Columbus and get a warrant." I told him that we could take him to jail without a warrant, and he seemed much relieved. Mr. Comer, Mr. Woolly, and T. Anthony were guarding him when I got to the house.

S. S. JENKINS testified: I have known prisoner since 1857, lived on adjoining farms for a short time; he made good crops. I was guardian for the Bachelor children, and had business with prisoner; prisoner would take his receipts when he paid money. I lived near him from 1857 until 1863; from my acquaintance and dealings with him I never saw anything indicating insanity.

*Cross-Examined:* I loaned prisoner some money in 1863 to buy some lands. I have had but little business with him since 1863. When he was not in liquor he was a good neighbor and a kind man.

WILLIAM H. WALTERS testified: I have known prisoner since 1864. I was staying in the hospital, and when I went home prisoner had moved in the settlement; I was from that time a close neighbor. I and prisoner and another neighbor were selected to arbitrate a difficulty between Comer and a freedman, and prisoner, after consultation, agreed with us. My family visited prisoner's a few times, and have seen him frequently. The arbitration was in 1866. From my acquaintance and dealings I have always looked on prisoner as a sane man.

JAMES ROZIER testified: I knew the prisoner in Harris county in 1861 up to 1863; I was a neighbor, living within two miles; I and prisoner visited. From my acquaintance and dealings I think he has good common sense.

*Cross-Examined*: I knew his wife; I thought him a very kind man.

LOUIS ANTHONY testified: I am acquainted with prisoner, have known him five or six years; lived three-quarters of a mile from him. I never had much dealings with prisoner, only about thirty or forty cents; our families visited each other; I drove by prisoner's house in the morning before the killing took place; prisoner was sitting on the piazza; I said to him, "Good morning, Mr. Anderson, how are you getting on;" he replied, "I am no better, I am getting worse." I asked him how his wife was, and he said, "my wife is sick—my wife is sick," but I did not see his wife; I was studying about it, as to his sanity, and consider him sane. Witness was asked why he studied about his insanity, he replied he always had a reckless way about him, drunk or sober.

*Cross-Examined:* I think he came home on the Thursday before the killing; he seemed to be always restless.

JOHN LIGON testified: I have known the prisoner; I have known him since the latter part of 1863; I have had dealings with him; never visited his house; he generally traded with me when he came to town. From my dealings with him I should say that he was a sane man.

*Cross-Examined:* My opinion of his sanity is only from my dealings. He was pretty fond of his liquor, and sometimes got drunk, and was drunk sometimes when he traded with me.

J. L. ANTHONY testified: I married a step-daughter of prisoner; I was at prisoner's house shortly after the killing; I saw him about twenty-five minutes after the killing; I rode up on my horse; prisoner said to me, "Don't shoot me." I told him he deserved it; that is all that passed between us

that day; I was at his house the Saturday before the killing, I drove along the road, and he was ploughing in the field; I asked him the privilege of hauling some poles, and he said "Go on and haul them." I knew the prisoner about three years; I had been married about two years, was with prisoner's family a good deal; prisoner was a farmer, and conducted his business well when he tried; he drank whisky; he was peaceable even while drinking. From these facts and my acquaintance with him, I think he was a man of good sense. I know nothing of his quarrels with the Bachelor boys.

*Cross-Examined*: He came home about the middle of the week previous to the killing; he was sober when I spoke to him about the rails; I don't think there was any whisky in the house.

JOHN WOOLY testified: I have known the prisoner about three years; we lived within three hundred and fifty yards of each other; I have had several business transactions with prisoner; I saw him on Saturday and on Sunday morning before the killing. I did not speak to him either time, as I only saw him in passing along the road. From my acquaintance and dealings with him, I looked upon him as a man of good sound mind. I asked the prisoner after the killing when I came up, to give me his knife, and he refused to give it to me, saying that I was no friend of his; about an hour after the killing Mr. Whipple rode by in a buggy; prisoner called out to him to get him a Bible with large print.

*Cross-Examined:* I am the prosecutor in this case; am not related to any of the parties; I did say when asked about the witnesses in this case that I had my sheep trained; prisoner was in the habit of drinking a great deal. He had been drunk in Columbus two or three weeks before the killing. He was sober on Sunday morning before the killing.

DR. C. TERRY testified: I have heard the testimony in the case; I have practiced medicine for twenty years. From the testimony I have heard, I am of the opinion that he was not an insane man in the full meaning of the word at the

Anderson *vs.* The State of Georgia.

time of the killing; by an insane man I mean a man in the condition not to know right from wrong; from the abstinence from drink after the excessive drinking testified to, his mind was evidently in an unsound condition, as is frequently produced by abstinence after excessive drinking.

### TESTIMONY IN SUR-REBUTTAL.

DR. F. A. STANFORD testified: I have heard the additional facts, and I have heard nothing in them to change my previously expressed opinion.

DR. T. J. WORD: I have heard the additional facts, and I have heard nothing in them to change my previously expressed opinion.

The charge of the Court does not appear by the record except as is stated hereafter. The jury found the defendant guilty. His counsel moved in arrest of judgment upon the grounds that the indictment was void because it was found true, after the adoption of the Constitution of 1868, by jurors not drawn under the provisions of that Constitution, *i. e.* from upright and intelligent citizens of the county, without distinction between the classes of persons who compose grand and petit jurors; the grand jurors were selected from such of the tax-payers of the county as, in the opinion of the Justices of the Inferior Court, with the sheriff and Clerk, were fit and proper persons to serve as grand jurors, as distinguished from those who were qualified to sit as petit jurors. In support of this they produced the minutes of May Term, 1868, by which it appeared that the jurors for November Term, 1868, were drawn under the old law, by which the distinction between grand and petit jurors was kept up. The motion in arrest was overruled.

Thereupon defendant's counsel moved for a new trial, upon the following grounds, the recitals of which are certified to be a true statement of what occurred on said trial:

1st. Because at the trial of said case the Court refused to allow counsel for defendant to ask Carlisle Terry, a physi-

cian, on his cross-examination, to express to the jury the structure of the brain, what changes were produced upon it by bodily disease, and how its inibation or inflammation was calculated to present to the mind unreal images, upon which a person with a diseased brain might be induced to act as though the imaginary impressions were real existences.

2d. Because the Court charged the jury that, if the condition of the defendant's mind was such that he could distinguish right from wrong, good from evil, and while in such condition he killed his wife, this would be murder, unless defendant reduced the crime by evidence which would show justification, or which would reduce the act to some degree of homicide lower than murder. The Court then explained to the jury the various degrees of homicide, manslaughter, etc., but refused to charge, though requested in writing by defendant's counsel so to do, as follows:

3d. If the jury believed some controlling disease was in truth the acting power within him, which he could not resist, and he had not a sufficient use of his reasons to control the passions which prompted the act complained of, he is not responsible, and again charged the jury, "that if the condition of defendant's mind was such that he could distinguish right from wrong, good from evil, and while in such condition he killed his wife, the law will hold him responsible."

4th. Because the Court refused to charge the jury, on the request of defendant's counsel in writing, " that they might find a verdict on the special plea of insanity, either for or against the plea, as they might find the fact; but did charge the jury that they must bring in a verdict of not guilty or guilty of such crime as they might find the prisoner to have committed under the indictment."

5th. Because the Court refused to charge the jury, on request of defendant's counsel in writing, "that the jury are judges of the law and facts, are not bound to take the law from the Court, if, having given the law so charged due weight and consideration, you cannot in your consciences bring your

Anderson *vs.* The State of Georgia.

judgment to accept the law as given to you in charge by the Court," but did charge them, " that they were judges of the law and the facts, so as to enable them to apply the law to the facts, and bring in a general verdict, but that they had no right to make law. The law was laid down in the Code. It was the province of the Court to construe the law and give it in charge, and of the jury to take the law as given, apply it to the facts as found by them, and bring in a general verdict."

6th. Because the jury found against the weight of evidence under the following charge given by the Court: " If upon the whole evidence given in the case, the jury entertain a reasonable doubt as to the sanity of the prisoner at the time of the commission of the alleged act, they are bound to acquit him."

9th. Because the Court refused, at the request of defendant's counsel, to allow the evidence to be read over to the witnesses, (the witnesses did not request the same) that they might correct any errors in taking it down, and frequently, during the trial, directed the Clerk not to take down the testimony in the language of the witnesses, but only its substance, and directed the Clerk from time to time, in the presence of the jury, what evidence to put down as material, and what to omit as immaterial, saying this is not for you, (the jury,) this evidence is for another purpose. " You must pay attention to what evidence the witnesses deliver from the stand." The Judge particularly remarked to the jury, " you must pay no attention to any directions to the Clerk, you have nothing to do with this; this is for another purpose. You must take the evidence from the witnesses. Endeavor to remember it all, and make your verdict on the evidence as given by the witnesses upon the same."

The Court refused a new trial, ahd sentenced the prisoner.

The case comes here upon errors assigned to the refusal to grant a new trial; to allow Dr. Terry to answer said question ; to allow the evidence of the witnesses to be read over

to them respectively, and the directions given to the Clerk as to taking down the testimony; the several charges given and refused.

R. J. Moses, L. F. Gerrard, for plaintiff in error, said indictment void: Art. 1, sec. 3, Const. 1868; Irwin's Code, sec. 4570; Art. V, Sec. 13, Const. 1868; Acts 1868, 128; Acts 1869, 139; 3d (Ga. R.) Kelly, 55; 1st, 631; 4th, 147; 1st Ch. Cr. L., 309. As to jurors being judges of law and fact: Erskin's speech; Dean of St. Asalph's case; Irwin's Code, secs. 4556, 3855; 3d Ga. R., 444; 16th, 603-4-5; 18th, 231; 22d, 484; 25th, 527; 30th, 383, 856. As to sound mind: 1 Russ on Cr., 12, 13, 14; 3 Kelly, (Ga. R.) 310; 31st, 424. As to drunkenness: 3 S. & M. R., 318. Ignorance of law, as it affects malice: 30th Ga. R., 383. As to the remarks by the Court: Act 1850; Cobb's N. Dig., 462; 12th Ga. R., 148; 38th, 73; 37th, 93; 40th, 391. As to practice under special plea of insanity: Irwin's Code, 4234, 4579; 1 Russ on Cr., 15, 17; Barrow's case; 1st Lewin, 238; Oxford's case, 38; E. C. L. R., 223. As to the verdict: Irwin's Code, section 3696; 7th Ga. R., 207.

H. L. Benning, C. J. Thornton, Solicitor General for the State, replied, the indictment was not void: Act of 1868, 127. Terry's reply was properly excluded: 1st Gr. Er., 440. As to the refusal to charge: 2d Parson's S. C. cases, 439; Code, sections 4234, 4522, 4231, 4579; 38th Ga. R., 507. As to jurors being judges of law: 40th Ga. R., Brown vs. State. The taking down of the evidence is in control of the Judge: Code, section 4599.

Warner, J.

After a careful review of the evidence contained in the record of this case, as well as the several grounds of error alleged therein to the rulings of the Court on the trial thereof, we are unable to bring our minds to the conclusion that there

is any sufficient error, which under the law, would authorize this Court to reverse the judgment of the Court below in refusing to grant a new trial.

Let the judgment of the Court below be affirmed.